IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

SAMUEL VIGIL, as Personal Representative
of the Estate of Jacqueline Vigil,

        Plaintiff,

v.                                        Case No. 21-cv-00147 MV-KK

Albuquerque Mayor TIM KELLER, in his
individual and official capacity;
THE CITY OF ALBUQUERQUE;
Albuquerque Police Officer CODY TAPIE,
in his individual and official capacity; and
Officer JOHN DOE, in his individual and
official capacity,

        Defendants.

## **PLAINTIFF'S FIRST AMENDED COMPLAINT FOR DAMAGES**

Samuel Vigil, as Personal Representative of the Estate of Jacqueline Vigil ("Plaintiff"), through undersigned counsel, complains as follows against Albuquerque Mayor Tim Keller ("Mayor Keller") in his individual and official capacity; the City of Albuquerque ("The City"); Albuquerque Police Officer Cody Tapie ("Tapie"), in his individual and official capacity; and Officer JOHN DOE, in his individual and official capacity, (collectively, "Defendants").

## **NATURE OF CASE**

1.      This is a wrongful death action brough by the Estate of Jacqueline Vigil. Ms. Vigil was a 55-year old mother and grandmother who was tragically gunned down in her own driveway in the early hours of the morning on November 19, 2019.

2.      This senseless death was the result of the Defendants' deliberate indifference regarding an escalating pattern of criminal violence by known illegal aliens, Luis Talamantes-

Romero ("Talamantes-Romero"), Eduardo Aguilar ("Aguilar"), as well as street thug Isaac Ramirez-Soto ("Ramirez-Soto").

3. Mayor Keller placed political principles over the safety of the citizens of Albuquerque, which led to the tragic loss of life and other violent gun crimes described in this Complaint. Many other similarly situated individuals have also been harmed due to the policies in place which prohibit City employees from coordinating with federal law enforcement to keep dangerous illegal aliens off of the streets in Albuquerque.

4. In October 2019, Albuquerque Police Department ("APD") Officer Cody Tapie responded to two separate, but related, complaints that Aguilar and Talamantes-Romero had shot at a dwelling and had also pursued a male individual in a vehicle chase shooting at him repeatedly on a public roadway. When the Bernalillo County District Attorney's Office learned about this incident, they filed a motion to detain Aguilar without bond because the District Attorney's Office claimed that Aguilar was so dangerous that nothing short of keeping him in jail pending trial would keep the community safe.

5. This motion was filed almost a year after Talamantes-Romero killed Jacqueline Vigil in November 2019 and a year after Talamantes-Romero and Aguilar had gone on an armed crime spree. Aguilar has a history of committing violent felony offenses with firearms, including Aggravated Battery with a Deadly Weapon (to-wit: firearm) and Attempted First Degree Murder. Aguilar is also an illegal alien. Both Talamantes-Romero and Aguilar are members of the Juaritos Maravilla street gang.

6. Officer Tapie and APD failed in their duty to investigate crimes and keep the community safe from harm. While APD knew that Aguilar and Talamantes-Romero had committed these brazen acts of gun violence in October 2019, a criminal complaint was never filed

by APD. A criminal complaint was filed by an investigator in the Bernalillo County District Attorney's Office almost a year after the fact, well after Jacqueline Vigil had been murdered. Had Officer Tapie and APD complied with their statutory duty to investigate and promptly file criminal complaints, Talamantes-Romero would have been behind bars and would have been prevented from continuing in his crime spree that ended with the senseless murder of Jacqueline Vigil.

7.      At no point in time, did Officer Tapie or any other City employee communicate to federal immigration authorities that either Talamantes-Romero or Aguilar were in the country illegally.

8.      Talamantes-Romero due to his criminal history, illegal re-entry after deportation, and his possession of multiple firearms and crime spree he engaged in *before* the murder of Ms. Vigil would have subjected Talamantes-Romero to a federal fifteen (15) year prison term.

**PARTIES**

9.      Plaintiff Samuel Vigil, as Personal Representative of the Estate of Jacqueline Vigil, is a resident of Albuquerque, Bernalillo County, New Mexico.

10.     Decedent Jacqueline Vigil was a resident of Albuquerque, Bernalillo County, New Mexico. The beneficiaries of the wrongful death estate are Ms. Vigil's husband and two adult children.

11.     Defendant Tim Keller was at all material times the elected Mayor of the City of Albuquerque. Suit is brought against him in his individual and official capacity.

12.     Defendant Cody Tapie was at all material times employed as a police officer with the City of Albuquerque at APD. Suit is brought against him in his individual and official capacity.

13.     Defendant the City of Albuquerque ("The City") is a New Mexico municipality. Its main office is located at 1 Civic Plaza, Albuquerque, NM 87102.

14.     Defendant John Doe is a police officer employed by the Albuquerque Police Department.  This police officer responded to an auto burglary committed by Luis Talamantes-Romero.  He is sued in his individual and official capacity.  When John Doe's true name is learned, he will be named by amendment.

## JURISDICTION

15.     Jurisdiction is proper in New Mexico as all of the facts giving rise to Plaintiff's claims occurred in New Mexico and all parties reside in New Mexico.

16.     Jurisdiction is also proper because, through this action, Plaintiff seeks to vindicate rights afforded them by New Mexico under New Mexico State law.

17.     Venue is proper pursuant to NMSA 1978 § 38-3-1.

18.     The City was on actual notice that litigation may occur under the Tort Claims Act given the circumstances of Ms. Vigil's death.

19.     Notice to sue a public employee under the New Mexico Tort Claims Act is not required under New Mexico law.

## ALLEGATIONS

20.     On November 19, 2019, Jacqueline Vigil, a 55-year old beloved wife, mother and grandmother was shot in the head as she sat in her car. She was headed to the gym.

21.     Her killer was Talamantes-Romero. Talamantes-Romero was with Ramirez-Soto at the time of the murder. Talamantes-Romero is aptly described by the FBI as a violent repeat offender and previously deported criminal alien.

22.     Talamantes-Romero has been in and out of the Bernalillo County Metropolitan Detention Center multiple times over the past fourteen (14) years due to his escalating pattern of criminal violence against women and motorists in Albuquerque.  He was first deported from the

United States on September 7, 2006. He returned to the United States a few months later and went on a violent crime spree.

23.     On December 10, 2006, **Talamantes-Romero** committed the crime of assault on a household member in Albuquerque.

24.     Five days later Talamantes-Romero battered the same household member, his girlfriend, also in Albuquerque.

25.     On June 27, 2007, Talamantes-Romero committed more domestic violence against the same girlfriend he had previously beaten, in this incident he also committed criminal damage to property.

26.     Talamantes-Romero was arrested yet again on February 22, 2008, for Driving While Intoxicated in Albuquerque.  In that case, he was driving recklessly, endangering the safety of other motorists, and he gave an alias to police when he was arrested. On June 27, 2008, he pleaded guilty to a single count of DWI.

27.     On April 6, 2008, Talamantes-Romero committed the crime of battery on a household member in Albuquerque. The victim in this case was the same woman in the prior battery cases described above.

28.     Six days after Talamantes-Romero beat his girlfriend, he was charged with the crime of harassing her via telephone – he was presumably interfering in the judicial process by engaging in witness intimidation and should have been charged with a felony level offense.

29.     A mere *two days later,* on April 14, 2008, he was charged with yet another household battery on the same victim.

30.     Talamantes-Romero was, for reasons yet to be determined, deported from the United States a second time on November 7, 2008. On November 15, 2008, *one week* after he was

deported, Talamantes-Romero was already back in Albuquerque, charged this time with aggravated stalking, a fourth-degree felony.

31.     Then, on November 26, 2008, *eleven days* after he was charged with aggravated stalking, he was charged with aggravated assault with a deadly weapon, a **violent** felony offense.

32.     Talamantes-Romero's violent and dangerous conduct continued to spiral out of control when just two months later on January 6, 2009, he committed yet another aggravated assault with a deadly weapon and also committed the felony offense of false imprisonment. He was also indicted for receiving or transferring a stolen motor vehicle and receiving a stolen firearm.

33.     On January 16, 2009, Talamantes-Romero again committed the crime of receiving stolen property over $2,500, a third-degree felony.

34.     On February 11, 2009, Talamantes-Romero – who had been repeatedly arrested by APD and released despite his status as an illegal alien and multiple repeated felony offenses – committed the offenses of aggravated assault with a deadly weapon, shooting at a dwelling or occupied building, and shooting into or from a vehicle.

35.     Talamantes-Romero served a grand total of 4.5 years in prison for his 2009 crime spree.

36.     On February 26, 2015, Talamantes-Romero was charged with an auto burglary in Albuquerque. The case against him was never pursued by APD or the Bernalillo County District Attorney's Office despite his wanton and violent criminal history.

37.     Talamantes-Romero was incarcerated after his 2015 felony in Albuquerque for crimes he had committed in the state of Colorado. After serving that prison sentence, he was deported in 2019.

**Criminal Acts Committed by Talamantes-Romero while The City's 2018 Sanctuary City Policy is in Force**

38.     In 2018, The City enacted a policy which established that The City would not use any city resources to enforce or assist in the enforcement of federal immigration law. This policy went so far as to ban city employees, including police officers, from "detecting, apprehending, identifying, investigating, arresting, detaining, or continuing to detain a person based on the individual's immigration status or the belief that the person has committed a violation of immigration law." The policy also prohibited City employees from honoring in any way a federal immigration detainer or from gathering information about any person's national origin or immigration status. This policy is hereinafter referred to as the "Sanctuary City Policy" and is attached as Plaintiff's Exhibit 1.

39.     The Sanctuary City Policy also prohibits the City, its employees or any third person acting on the City's behalf from making any inquiry regarding, or collecting in any way, information regarding the citizenship, immigration status, place of birth or national origin of any person.  The policy also states that "The City shall not disclose information that the City currently possesses regarding place of birth, religion, or national origin…absent a valid judicial warrant for such information or as otherwise required by law."

40.     Immediately after Talamantes-Romero was deported, he made a beeline to Albuquerque to live with his two sisters – who are also illegal aliens with criminal records.

41.     The City's Sanctuary City Policy championed and signed into law by Mayor Keller effectively provided Talamantes-Romero a home base to operate out of. His sisters are not law-abiding citizens and were investigated by the FBI for dealing drugs out of their home. *See* Criminal Complaint for being a person who is illegally or unlawfully in the United States and in possession of a firearm and ammunition; possession of a firearm in furtherance of drug trafficking; knowingly

lease, rent, use or maintain any place for the purpose of manufacturing, distributing, or using any controlled substance; possession with intent to distribute Methamphetamine; and possession with intent to distribute Buprenorphine; possession with intent to distribute Clonazepam;  attached as Plaintiff's Exhibit 2.

42.    The FBI identified several aliases for Elizabeth Talamantes and at least ten (10) prior incidents in which Elizabeth Talamantes was arrested for domestic violence battery, receiving stolen firearms, being a convicted felon in possession of a firearm, tampering with evidence, leaving the scene of an accident involving great bodily harm or death, fraud, child endangerment, auto theft, false claim to United States citizenship, and illegal re-entry.

43.    On December 16, 2018, Ms. Talamantes was arrested for domestic violence. Despite her concerning criminal history involving violence, guns and drugs, she was released from custody the very next day. She went into warrant status on that case at least once, was arrested, and bonded out of custody again. The City's Sanctuary City Policy effectively shielded her from deportation and in turn provided her the ability to house her criminal associates, including Talamantes-Romero, and enabled them to have a home base in Albuquerque to commit criminal acts.

44.    After Talamantes-Romero returned to Albuquerque in September 2019, he broke into a vehicle in a hotel parking lot in Albuquerque. He stole a gun from that vehicle. Defendant APD Officer John Doe responded to this crime scene.

45.    Talamantes-Romero left significant forensic evidence at the crime scene including fingerprints from the car, as well as a drop of blood that returned as a match to Talamantes-Romero in the FBI's Combined DNA Index System ("CODIS").  This provided Defendant Officer John Doe and APD with the knowledge that Talamantes-Romero was back in Albuquerque committing

crimes and that he was armed and dangerous. *See* FBI Special Agent Bryan Acee's October 7, 2020 Search Warrant in Case No. 20-mr-1469, attached as Plaintiff's Exhibit 3, at ¶ 17.

46.     Despite APD having this knowledge which amounted to a red alert to any competent law enforcement agency that Albuquerque motorists and women living in Albuquerque would be hurt based on Talamantes-Romero's egregious history of violent conduct, APD did not contact federal immigration.

47.     The City's Sanctuary City Policy affirmatively prevented APD Officer John Doe or other City employees from notifying federal immigration authorities that Talamantes-Romero had illegally re-entered the United States. Even though he was back in Albuquerque, armed with a gun and committing crime.

48.     Following the auto burglary, Talamantes-Romero went on a months long crime spree in the City of Albuquerque. In October 2019, Talamantes-Romero and Aguilar, a fellow member of his gang, got into a confrontation with a young man in an Albuquerque parking lot. As the young man entered his vehicle and drove away from the altercation, Talamantes-Romero and/or Aguilar fired a gun at the young man. Talamantes-Romero and Aguilar then got into a vehicle and followed the young man for several miles while continuing to shoot at him.   The victim's car was struck by at least one bullet. APD responded to this incident and again knew or should have known that Talamantes-Romero was the perpetrator. Aguilar was identified to APD by name by another victim and Talamantes-Romero who was known to a witness to that crime as "Pelon" was also described in detail to APD officers. These details included his distinctive long ponytail hair cut.  The witness stated that Pelon was with Aguilar earlier in the day and also provided a description of Pelon's vehicle, a tan Jeep Cherokee.  Officers on the scene received the same vehicle description from the victim who had been shot at.

49.     In a 2009 case, D-202-CR-2009-05605, Pelon is listed as a known alias for Talamantes-Romero on the case caption. APD knew that Talamantes-Romero goes by Pelon.

50.     APD was previously on notice that Talamantes-Romero was back in Albuquerque and that he was armed and dangerous. They did nothing with that information which led to this young man being shot at multiple times. APD ignored this gift from God to avert tragedy and continued to value political principles over the safety and welfare of the citizens of Albuquerque.

51.     After this gangster-style shooting, APD did not inform federal law enforcement that Talamantes-Romero or Aguilar had illegally re-entered the country and committed multiple felony offenses.

52.     It is not hyperbole to describe Talamantes-Romero as a gangster – he is in fact a member of Juaritos Maravilla, a violent street gang based out of Juarez, Mexico. Agent Kyle Hartsock, the Special Agent in Charge of the Special Investigations Bureau at the Second Judicial District Attorney's Office describes the Juaritos Maravilla gang in an arrest warrant as follows: "Eduardo is a self described member of Juaritos Mara Villa, a documented gang that exists in pockets around the United States. The members of the gang have been involved in homicides, robberies, shootings and property crime in the Albuquerque area."

53.     Talamantes-Romero was assisted in this crime by his fellow Juaritos Maravilla gang member, Aguilar. Aguilar is also an illegal alien who was shielded from deportation by the City's sanctuary policy.

54.     Aguilar and Talamantes-Romero worked in concert to commit an act of domestic violence and intimidation on October 13, 2019. Aguilar had recently broken up with a girlfriend. The girlfriend knew that Aguilar was associating with "Pelon" (an alias and street name used by Talamantes-Romero). She expressed her distaste for "Pelon" and said that she did not want Aguilar

hanging around with him because Aguilar would "start to 'gangbang' with him." Following this argument, she heard a loud bang and discovered that a window to her young child's room had been broken by a rock. She told the police officer that Aguilar and "Pelon" were in "Pelon's" vehicle which she described as a tan Jeep.

55.     "Pelon" is an alias of Talamantes-Romero that has been known to APD and law enforcement in general for years. Here the police were told directly by a witness that Talamantes-Romero had committed a crime. APD had actual and undeniable knowledge that Talamantes-Romero was back in Albuquerque and in violation of federal law.   While APD responded to this call and generated an APD case number, 19-0094571, a criminal complaint against Talamantes-Romero for this incident was never filed.

56.     Given that the domestic violence incident and the shooting happened on the same day and that officers at the scene, including Officer Tapie, were told that Pelon was driving the same tan Jeep that had followed the male victim who was repeatedly shot at, there was probable cause to arrest Talamantes-Romero for shooting at or from a motor vehicle or acting as an accessory to that crime.

57.     On November 15, 2020, Talamantes-Romero committed *yet another* automobile burglary.

58.     It was foreseeable that Talamantes-Romero would commit additional acts of gun violence against Albuquerque motorists given his extensive history of automobile burglary and theft. There was foreseeable risk that Talamantes-Romero would use extreme violence to further his criminal goals given his long history of armed assaults upon other persons and shooting at people. Talamantes-Romero also has a long history of violence against women.

11

59.     Despite the commission of two serious felony offenses involving guns, knowledge that Talamantes-Romero was in the country illegally, and knowledge that Talamantes-Romero was working with Aguilar, a fellow Juaritos Maravilla gang member, who also had a violent criminal history involving guns, The City was deliberately indifferent to the grave danger Talamantes-Romero and the Juaritos Maravilla gang (which is heavily if not exclusively composed of illegal aliens) posed to law abiding Albuquerque residents who own and use automobiles.

60.     Talamantes-Romero could have been found had authorities been looking for him. He had numerous posts on social media that showed where he was and what he was driving. *See* Plaintiff's Exhibit 3 at ¶ 18-25. In these social media posts, Talamantes-Romero makes repeated efforts to sell firearms he has stolen.

61.     Aguilar was in APD custody in June 2018.[1] FBI Special Agent Bryan Acee states, in a sworn Affidavit in Support of Criminal Complaint and Arrest Warrant dated August 17, 2020, that Aguilar on June 14, 2019, APD officers responded to a report of shots being fired inside a residence on Williams Street SE, Albuquerque, New Mexico. *See* Affidavit in Support of Criminal Complaint and Arrest Warrant attached as Plaintiff's Exhibit 4 at ¶ 5. Officers made contact with the occupants of the home and at that time did not result in arrest or recovery of a firearm. *Id*.

62.     The following day on June 15, 2018, APD officers were dispatched to the same address at Williams Street SE. *Id*. at ¶ 6. One of Aguilar's relatives had reported that Aguilar was armed with a gun, schizophrenic and breaking things within the house. *Id*. APD officers arrived on scene and family members fled the house. *Id*. Aguilar refused to come out of the home peacefully and APD Special Weapons and Tactics (SWAT) team was called to handle the situation.

---

[1] The FBI Affidavit provides the date of June 2019 for the date of offense. It appears that the crime described in the affidavit actually occurred in June 2018 based on the affidavit submitted by the investigating officer at APD, as well as the subsequent motion for pre-trial detention filed by the Albuquerque District Attorney's Office and the subsequent Grand Jury Indictment.

Relatives told APD officers that Aguilar had fired a black revolver inside the house the day prior and hid the gun in a closet when police responded. *Id.*

63.     After SWAT contained the location, they arrested Aguilar. *Id.* at ¶ 7. APD obtained a search warrant for the residence and recovered a black .357 magnum revolver that had been hidden inside of a wall vent, "secreted behind a piece of wood." *Id.*

64.     Despite Aguilar's criminal history involving a charge of attempted first degree murder, the grave nature of the circumstances of his June 2018 arrest, and his status as an illegal alien, he was released from custody without federal authorities ever being notified that he was in custody. This is truly remarkable given that the Second Judicial District Attorney's Office filed a motion to detain Aguilar without bond – in a motion where they requested the Court order Aguilar be kept in jail indefinitely until a jury trial could commence "because there are no conditions for Defendant [Aguilar] that will reasonably protect the safety of the community."

65.     The Second Judicial District Attorney's Office filed a *second* motion to detain Aguilar without bond where they again stated in their motion that there are no conditions of release that would adequately protect the community. The factual basis for this motion was the shooting that Aguilar and Talamantes-Romero committed in October 2019, where they followed a man in a vehicle for miles and firing their guns at him. The District Attorney's Office was in fact correct that nothing short of keeping Aguilar in custody would protect the community. Unfortunately, the City's Sanctuary City Policy prevented City employees from informing federal immigration authorities that Aguilar, a violent felon and undocumented immigrant, was engaged in a crime spree in Albuquerque with Talamantes-Romero. Even more unfortunate is the fact that Officer Tapie did not timely file a criminal complaint for the October 2019 shooting, which prohibited the

Bernalillo County District Attorney's Office from filing their second motion for pretrial detention until nearly a year after Talamantes-Romero murdered Jacqueline Vigil.

66.     While officers, including Officer Tapie, were speaking with the male shooting victim, a police officer said that these guys are obviously dangerous, referring to Aguilar and Talamantes-Romero.

67.     Officers at this scene, including Officer Tapie, had Aguilar's full name and date of birth.  They also could have learned Aguilar's phone number as they were speaking to his ex-girlfriend and Aguilar had contacted her via phone and text message in the past.

68.     On November 18, 2019, the day before he killed Jacqueline Vigil, Talamantes-Romero publicly identified himself as belonging to the Juaritos Maravilla street gang.  Plaintiff's Exhibit 3 at ¶ 26. The City's Sanctuary City Policy apparently went so far that APD was willfully ignoring the operations of a Mexican street gang infamous for acts of extreme gun violence. This was another red alert that provided an opportunity for authorities to apprehend Talamantes-Romero – this alert was also ignored.

69.     On November 19, 2019, Talamantes-Romero's crime spree spiraled out of any semblance of control as he committed multiple automobile burglaries in a 24-hour period. Talamantes-Romero along with another known associate, Ramirez-Soto, cruised around Albuquerque while drinking alcohol and snorting cocaine looking for people to prey upon. *Id*. at ¶¶ 27-28.

70.     Talamantes-Romero crashed the vehicle he was driving, likely due to his abuse of alcohol and drugs. His tire was leaking air, but he and Ramirez-Soto managed to drive to a nearby apartment complex and steal a replacement tire from a vehicle in the apartment parking complex.

This act of property damage and DWI was also foreseeable given the history of DWI and automobile theft. *Id*. at ¶ 29.

71.     At approximately 4:15 a.m., a man called 911 and reported two Hispanic males were breaking into his Cadillac. The victim confronted the two men from a balcony and one of the suspects said, "agarra el cuete" (grab the gun). The victim then observed one of the suspects retrieve a pistol and look directly at him, at which time the victim backed away from the balcony out of fear that he was about to be murdered. The two men entered a Jeep Cherokee and fled the scene. *Id*. at ¶ 30.

72.     Talamantes-Romero, Ramirez-Soto, and the vehicle they were driving were captured on the apartment complex's surveillance video system; upon information and belief, the victim was also able to describe the assailants and their vehicle. Had APD promptly put out an all points bulletin (APB), Talamantes-Romero could have been apprehended. Instead of doing that, APD responded to the call the following day – after Jacqueline Vigil had already been murdered. This was the final red alert in a long line of red alerts that were ignored.

73.     Approximately an hour after Talamantes-Romero and Ramirez-Soto were reported to have engaged in an automobile burglary and aggravated assault with a deadly weapon, Talamantes-Romero observed Jacqueline Vigil get into her car. He then exited his vehicle, threatened Jacqueline with a gun, and after she honked her car horn to seek help from her husband, Talamantes-Romero shot Jacqueline in the head at close range.

74.     As Talamantes-Romero ran back to the car and Ramirez-Soto drove them away from the scene of this heinous crime, Jacqueline's husband Sam came outside and saw Jacqueline's lifeless body slumped behind the steering wheel of the car.

75.     This act of cold-blooded murder was sadly predictable. Talamantes-Romero has an extreme history of violence, specifically gun violence, which was known to APD.  This criminal history would be available for both Defendants, Officer John Doe and Officer Tapie, to review as APD has access to NCIC.

76.     Talamantes-Romero's crime spree in 2019 followed the same trajectory as his crime spree in 2009. It was inevitable that he was going to kill or gravely injure a person in Albuquerque during an automobile theft or burglary.

77.     He was aided in committing these crimes by his sisters, Aguilar, and Ramirez-Soto. Talamantes-Romero and his sisters are illegal aliens who were also shielded from deportation by The City's Sanctuary City Policy. The City's Sanctuary City Policy provided Talamantes-Romero with a home base to operate out of, with criminal associates (Aguilar and Ramirez-Soto) to help him commit these terrible acts of violence, and enabled him to commit the acts in the first place due to the policy tying APD's hands and preventing them from informing federal immigration that Talamantes-Romero was back in Albuquerque and armed with a gun.

78.     This senseless killing could have been prevented at multiple points in time had Officer Tapie and Officer Doe expended even minimal effort to charge, find or arrest Talamantes-Romero.  The City and its employees, including the officer defendants failed to react appropriately to any of the numerous red alerts that Talamantes-Romero was engaging in a dangerously escalating pattern of gun violence. If Officer Tapie, Officer John Doe, or any other City employee reported Talamantes-Romero to federal law enforcement or federal immigration, he would have been a high priority target for arrest for illegal re-entry, as well as illegal possession of firearms and ammunition.

79.     The City's policy was designed to frustrate the purpose of or intentionally violate U.S. Immigration law that prohibits any government entity from prohibiting or in any way restricting a person or entity from sending information regarding a person's citizenship or immigration status. *See* 8 U.S.C.A. § 1373 (West).

80.     City Councilor Pat Davis gave an on record statement to a reporter on the City's Sanctuary City Policy where he stated, "[w]hat our bill simply says is, 'we comply with the federal law that requires us to turn over information if we have it.' We're just not going to have it." The stated purpose of the City's Sanctuary City Policy, according to Councilor Davis, is for the City and all of its employees to be willfully blind.

81.     Upon information and belief, Mayor Keller and the City Council were aware that they were prohibiting law enforcement officers from contacting federal immigration even in cases where a person is a violent felon.

82.     The Sanctuary City Policy contains no exception to allow law enforcement or other City employees to communicate with federal immigration about a person based on the individual characteristics of a person including, but not limited to, that person's criminal history and propensity to commit violent crime.

83.     The Sanctuary City Policy contains no exception to allow law enforcement or other City employees to communicate with federal immigration about violent street gangs whose membership primarily consists of illegal aliens such as Talamantes-Romero's street gang, Juaritos Maravilla.

84.     Upon information and belief, Mayor Keller, the City Council, APD Officers and APD leadership are aware that some of the violent felony offenses committed in Albuquerque are committed by illegal aliens.

85.     Upon information and belief, Mayor Keller, the City Council APD Officers and APD leadership are aware that some of the violent felony offenses committed in Albuquerque are committed by street gangs whose membership primarily consist of illegal aliens.

86.     Upon information and belief, Mayor Keller and the City Council know that it is significantly easier to prove that a person is in the country illegally than it is to prove that they have committed any suspected criminal act beyond a reasonable doubt.

87.     Mayor Keller and the City Council are the final policymakers for the City of Albuquerque.

88.     Mayor Keller and the City Council were deliberately indifferent to the dangers created by the Sanctuary City Policy with regard to its uniform application to all persons without exception, including persons who have violent felony histories, a history of committing gun crimes, a history of preying upon women, a history of criminal activity targeting motorists, and people who are in street gangs.

89.     In October 2018, the City applied for a federal grant to fight crime. The federal government awarded the City $452,108 with several conditions in the grant, including that the City agree to not prevent any person or entity from contacting or communicating with Immigration and Naturalization Services regarding a person's immigration status. This grant stipulation was in conflict with the City's Sanctuary City Policy. The City chose to prioritize its Sanctuary City Policy over community safety and declined to accept the half million dollars in 2018. Violent crime rates in Albuquerque have surged since 2018.

**FIRST CAUSE OF ACTION**
**42 U.S.C. § 1983 - Violation of Jacqueline Vigil's Rights to Substantive and Procedural Due Process under the United States Constitution**
**(Against Officer Tapie and Officer John Doe in their individual and official capacities)**

90.     Plaintiff incorporates and reasserts the allegations as set forth in the foregoing paragraphs as though fully stated herein.

91.     Officers Tapie and John Doe at all times acted under color of law.

92.     Jacqueline Vigil possessed rights under New Mexico State Law to have APD competently investigate criminal activities and act in a reasonable fashion as described by the New Mexico Supreme Court in *Torres v. State*, 1995-NMSC-025, 894 P.2d 386. These rights were intended by the New Mexico legislature to be enforceable in court. Based on NMSA 1978, § NMSA 29-1-1 and *Torres,* Jacqueline Vigil had a reasonable expectation that APD would competently execute their statutory duty to investigate crimes.

93.     Jacqueline Vigil's rights to life, liberty and bodily integrity were violated without procedural due process as guaranteed by the Fourteenth Amendment to the United States Constitution.

94.     There are no post-deprivation procedures available to provide Ms. Vigil with adequate due process – the liberty interests at stake are extremely important and no post-deprivation procedure would be adequate in these circumstances.

95.     The Defendants engaged in several affirmative acts in this case. The City and Mayor Keller enacted a Sanctuary City Policy which frustrated the enforcement of federal law and increased the danger that illegal aliens, including repeat violent felony offenders and members of illegal street gangs like Talamantes-Romero and Aguilar, would be able to reside in Albuquerque and commit criminal acts in Albuquerque without risk that they would be subject to deportation for federal crimes or immigration violations.

96.     The City of Albuquerque actually held Aguilar in custody in June 2018 for committing a violent gun crime. He was released from jail and pursuant to the Sanctuary City Policy he was shielded from federal immigration.

97.     The Defendants at numerous points in time breached their duty to investigate and to act in a reasonably prudent manner as provided by New Mexico State law.

98.     Jacqueline Vigil was injured by Talamantes-Romero as a proximate result of the Defendants' affirmative acts.

99.     Her vulnerability to danger was increased by Defendants not putting out information to warn the public about Talamantes-Romero. Her vulnerability to danger was increased due to APD's failure to put out an APB following the auto burglary and aggravated assault that occurred an hour before the attempted car theft and murder of Jacqueline Vigil. The Defendants and Talamantes-Romero created the dangerous situation that directly led to Jacqueline Vigil's death. This actions cut off Ms. Vigil's opportunity to receive private aid.

100.    Ms. Vigil also possesses a substantive due process right to be free from state created danger. That duty was breached by the Defendants due to their actions as described in this complaint.

101.    Jacqueline Vigil was a member of a group of limited persons, motorists in the City of Albuquerque, that Talamantes-Romero posed a risk of immediate, serious and proximate harm towards. This risk of harm existed at least as early as October 13, 2019. On November 19, 2019, Talamantes-Romero and Ramirez-Soto were engaged in a crime spree that was reported to APD. Motorists and residents of Albuquerque who owned cars accessible to Talamantes-Romero within the immediate area of the aggravated assault and attempted auto burglary reported roughly an hour before Jacqueline's death were all at risk of serious and immediate harm – it was foreseeable based

on the knowledge available to APD that Talamantes-Romero would continue his violent crime spree in the area near his last crime.

102.    Defendants' failure to investigate the criminal acts described in this Complaint and Defendants' failure to act in a reasonably prudent manner as described by *Torres* placed Ms. Vigil at serious risk. This risk was obvious and known. The Defendants' actions were in reckless disregard of the risks posed by Talamantes-Romero and the totality of the circumstances are conscience shocking.

103.    Defendants Tapie and John Doe created the dangerous condition by failing to adequately investigate the crimes committed by Talamantes-Romero.  In Officer Tapie's case, another police officer actually stated at the crime scene to the shooting victim that the people who shot at him are dangerous.  The officers discussed what the victim could do with his vehicle to cover up the bullet hole.  Officer Tapie did not make any arrest or issue a summons despite having clear information to implicate Aguilar and Talamantes-Romero.

## SECOND CAUSE OF ACTION
**42 U.S.C. § 1983 - Violation of Jacqueline Vigil's Rights to Procedural Due Process under the United States Constitution**
**(Against Mayor Keller in his individual and official capacity and The City)**

104.    Plaintiff incorporates and reasserts the allegations as set forth in the foregoing paragraphs as though fully stated herein.

105.    Mayor Keller at all times acted under color of law.

106.    The Sanctuary City Policy on its face violates federal immigration laws. 8 U.S.C. §§ 1373 and 1644 which together prohibit any local government from prohibiting local government entities, any government entity or government officials from communicating any information to the Immigration and Naturalization Service regarding a person's immigration status.

107.    The City knowingly designed the Sanctuary City Policy to try to avoid the reach of the aforementioned laws. This is evidenced perfectly in City Councilor Pat Davis's statement that federal law requires that this information be communicated – and the City would "comply" with the law by intentionally and willfully not having the information in the first place.

108.    There is no nuance or discretion in the City's ordinance. No exceptions are built in to allow local law enforcement to communicate immigration information about violent repeat offenders like Talamantes-Romero.

109.    Mayor Keller, in signing the ordinance into law with deliberate indifference for the foreseeable risk of harm it would cause, has personal responsibility for the constitutional violations suffered by Jacqueline Vigil.

110.    The Sanctuary City Policy was a moving force behind Jacqueline Vigil's injury. Aguilar was actually in police custody in 2018 and his immigration status was not communicated to federal immigration. Elizabeth Talamantes was also in police custody in 2018 and her immigration status was not communicated to federal authorities.

111.    Talamantes-Romero was deported from this country after he was engaged in a violent crime spree. The record of his deportation will, upon information and belief, be contained in national criminal databases that APD has access to. Officer Tapie, Officer John Doe, and any other police officer who could check NCIC would have actual knowledge that Talamantes-Romero was in the country illegally.  Upon information and belief, these officers had reason to check NCIC for Talamantes-Romero by name and/or his alias, "Pelon."  His wanton crime spree could have been stopped with a phone call to immigration long before Jacqueline Vigil was killed.

112.    The policy championed by Mayor Keller that the City and its employees be willfully blind to every person's immigration status and that the communication of a person's

immigration status to the federal government is outright prohibited was a moving force behind both the creation of the state created danger in this case and the failure to protect Ms. Vigil and Talamantes-Romero's other victims from that danger.

**THIRD CAUSE OF ACTION**
**Battery under the New Mexico Tort Claims Act, NMSA 1978, § 29-1-1 and § 41-1-12**
**(Against Officer Tapie in his individual and official capacity, Officer John Doe in his**
**individual and official capacity, and against the City of Albuquerque)**

113.   Plaintiff incorporates and reasserts the allegations as set forth in the foregoing paragraphs as though fully stated herein.

114.   Defendants were at all times acting under color of law.

115.   Officer Tapie, Officer John Doe and APD possess duties to competently investigate crimes and "diligently file a complaint or information, if the circumstances are such as to indicate to a reasonably prudent person that such action should be taken.…Failure to perform his duty in any material way shall subject such officer to removal from office and payment of all costs of prosecution." NMSA 1978, § 29-1-1.

116.   Officer Tapie, Officer John Doe and APD also owe a duty, under New Mexico common law, to exercise, for the safety of others foreseeably at risk, that care ordinarily exercised by reasonably prudent and qualified officers. See *Torres v. State*, 1995-NMSC-025, ¶ 27, 119 N.M. 609, 616, 894 P.2d 386, 393 (Permitting lawsuit from estates of murder victims in California against APD and APD Officers to proceed to jury trial for wrongful death caused by APD's failure to apprehend murderer in Albuquerque who subsequently traveled to California and murdered two California residents under theory that breach of duty to investigate and act in a reasonably prudent manner proximately caused battery).

117.   These duties were breached when Officer Tapie, after speaking to the October 13, 2019, shooting victims, did not diligently file a criminal complaint. Officer Tapie's failure to

23

follow up on his investigation and failure to file a complaint prevented the Bernalillo County District Attorney's Office from pursuing charges and filing pre-trial detention motions for both Aguilar and Talamantes-Romero.

118.    Officer John Doe breached his duties under New Mexico state law because a complaint was not timely filed.

119.    Talamantes-Romero has still not been charged with a criminal complaint in either of the October 13, 2019 shootings even though APD has actual knowledge as to his involvement in those shootings.

120.    Officers who have yet to be identified by name breached their duty to investigate and act in a reasonably prudent manner by ignoring the numerous red alerts that Talamantes-Romero would engage in violence as described in detail in this Complaint.

121.    Jacqueline Vigil and the other people that Talamantes-Romero victimized in his crime spree following October 13, 2019, were foreseeable victims of further crimes committed by Talamantes-Romero.

122.    Jacqueline Vigil was shot while in her car during an attempted automobile burglary or theft.  This fits Talamantes-Romero's long established pattern of criminality.

123.    Talamantes-Romero battered Jacqueline Vigil by shooting her in the head – that battery was made possible due to the breaches by Officer Tapie, The City and APD.

124.    The City had actual notice that Officer Tapie and Officer John Doe breached their duty to investigate under state law.  APD and APD Officers knew or should have known that "Pelon" is Talamantes-Romero. There were two separate criminal cases described in succeeding paragraphs that Talamantes-Romero had committed in the months leading up to his murder of Jacqueline Vigil. APD had identified Talamantes-Romero as the prime suspect in Jacqueline

Vigil's murder case. APD, upon information and belief, possesses the capability to cross reference cases involving the same suspect and regularly does cross reference cases involving the same suspect. They did in fact cross reference the previous shooting case involving Talamantes-Romero and identified him in part because the bullet casing at the homicide crime scene matched a bullet casing found in connection with the shooting at or from a motor vehicle where one of the assailants was described to law enforcement as "Pelon" who had a ponytail and drove a tan Jeep.

125.     The City had already made the connection between these cases and any reasonable City employee could see that mistakes had been made in the vehicle shooting case that may plausibly give rise to a lawsuit. This provided the City with actual notice as described in the notice provision of New Mexico's Tort Claim Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, prays for judgment against Defendants as follows:

126.     A judgment requiring Defendants to pay damages as required by law, as well as reasonable attorneys' fees and costs of suit. Punitive damages are warranted given the Defendants' repeated and preventable failures to protect Jacqueline Vigil and the other individuals who were harmed by Talamantes-Romero.

127.     Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues so triable.

Respectfully submitted,

*/s/ Robert J. Gorence*
Robert J. Gorence
Gorence Law Firm, LLC
300 Central Ave SW, Suite 1000E
Albuquerque, NM  87102
(505) 244-0214
gorence@golaw.us

---and---

*/s/ Jason Bowles*
Jason Bowles
Bowles Law Firm
4811 Hardware Dr. NE, Suite D-5
Albuquerque, NM  87109
(505) 217-2680
jason@bowles-lawfirm.com

---and---

*/s/ Todd J. Bullion*
Todd J. Bullion
300 Central Ave SW, Suite 1000E
Albuquerque, NM  87102
(505) 452-7674
toddjbullion@gmail.com