IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

SAMUEL VIGIL, as Personal Representative
of the Estate of Jacqueline Vigil,

        Plaintiff,

vs.                              Case No: 21-cv-00147 MV-KK

Albuquerque Mayor TIM KELLER
in his individual and official capacity,
THE CITY OF ALBUQUERQUE,
Albuquerque Police Officer CODY TAPIE
in his individual and official capacity,
Officer John Doe in his individual and official capacity,

        Defendants.

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS**

COMES NOW, the Plaintiff, Samuel Vigil, by and through his attorneys of record, and hereby responds to the Defendants' Motion to Dismiss Plaintiff's Amended Complaint [Doc. 17]. The Defendants seek the dismissal of each and every claim advanced by Plaintiff. The inescapable fact of the matter is that Jacqueline Vigil is dead because of the Sanctuary City Policy. The individual defendants and the City have subjected themselves to legal liability under the legal theories and causes of action advanced in Plaintiff's Amended Complaint. The Motion to Dismiss should be denied.

## I.      Legal Standard

Dismissal of a claim under Rule 12(b)(6) is appropriate where the plaintiff fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). Rule 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. (8)(a)(2). Rule 8(a)'s "short and plain statement" mandate requires that a plaintiff allege enough factual matter

1

that, taken as true, makes his "claim to relief ... plausible on its face." *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

"The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003). In doing so, the Court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Alvarado v. KOB–TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007). However, a court need not accept conclusory allegations. *Moffett v. Halliburton Energy Servs., Inc.*, 291 F.3d 1227, 1232 (10th Cir. 2002).

Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.' " *Erickson v. Pardus*, 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955) (ellipses omitted). The "plausibility" standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible. *Bryson*, 534 F.3d at 1286.

It is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity. Although an officer's "entitle[ment] to qualified immunity is a threshold question to be resolved at the earliest possible point," *Vakilian,* 335 F.3d at 516 (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 817, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)), that point is usually summary judgment and not dismissal under Rule 12. *See Evans–Marshall v. Bd. of Educ. of Tipp City Exempted Village Sch. Dist.,* 428 F.3d 223, 235 (6th Cir.2005) (Sutton, J.,

concurring) (observing that the fact-intensive nature of the applicable tests make it "difficult for a defendant to claim qualified immunity on the pleadings *before discovery* " (emphasis in original)); *see also Jacobs v. City of Chicago,* 215 F.3d 758, 775 (7th Cir.2000) (Easterbrook, J., concurring) ("Rule 12(b)(6) is a mismatch for immunity and almost always a bad ground of dismissal."); *Chesser v. Sparks,* 248 F.3d 1117, 1121 (11th Cir.2001) ( "[Q]ualified immunity is typically addressed at the summary judgment stage of the case."); *Grose v. Caruso,* 284 Fed.Appx. 279, 283 (6th Cir.2008) ("[T]he standard for a 12(b)(6) motion is whether the allegations, if taken as true, could state a claim upon which relief may be granted, [and] dismissal of Appellants on the basis of qualified immunity is premature."). *Wesley v. Campbell*, 779 F.3d 421, 433–34 (6th Cir. 2015)

Qualified immunity is almost always a bad ground for dismissal for failure to state a claim of a §1983 suit and is more appropriately addressed on a motion for summary judgment.  *Manos v. Caira, N.D.Ill.2001, 162 F.Supp.2d 979*. Qualified immunity is an affirmative defense and may require factual findings; it is therefore a proper subject for summary judgment, rather than a motion under subsec. (b)(6) of this rule.  *In re Jackson Lockdown/MCO Cases*, E.D.Mich.1983, 568 F.Supp. 869. The affirmative defense of qualified immunity is best assessed at the summary judgment stage, though courts in the Tenth Circuit will still hear qualified immunity challenges as part of a motion to dismiss. *Peterson v. Jensen*, 371 F.3d 1199, 1201–02 (10th Cir. 2004)

In reviewing a Rule 12(b)(6) motion in the context of qualified immunity, a district court should not dismiss a complaint "for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id*. citing *Currier v. Doran,* 242 F.3d 905, 917 (10th Cir.2001) (internal quotations omitted).

Appellate courts uphold a dismissal under Fed. R. Civ. P. 12(b)(6) only when it appears that the plaintiff can prove no set of facts in support of the claims that would entitle him to relief, accepting the well-pleaded allegations of the complaint as true and construing them in the light most favorable to the plaintiff. *Yoder v. Honeywell Inc*., 104 F.3d 1215, 1224 (10th Cir. 1997) (quoting Fuller v. Norton, 86 F.3d 1016, 1020 (10th Cir. 1996))

To state a claim for municipal liability under § 1983, a party must allege sufficient facts to demonstrate that it is plausible (1) that a municipal employee committed a constitutional violation; and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation. *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004).

The Tenth Circuit employs a two-step test when evaluating whether a citizen's right to procedural due process has been violated: "(1) Did the individual possess a protected interest to which due process protection was applicable? (2) Was the individual afforded an appropriate level of process?" *Clark v. City of Draper*, 168 F.3d 1185, 1189 (10th Cir. 1999).

## II.    Substantive and Procedural Due Process

In the instant case, the Plaintiff asserts claims that each of the Defendants have individually violated Jacqueline Vigil's right to procedural due process as well as her right to substantive due process. Defendants rely in large part on *Town of Castle Rock, Colo. V. Gonzales,* 545 U.S. 748 (2005), to support their arguments to dismiss the Plaintiff's procedural and substantive due process claims. While there are similarities between the instant case and *Castle Rock,* the state law in Colorado that Plaintiff argued created a property interest is markedly different from the New Mexico law at issue in the instant case. *Castle Rock* is also not a substantive due process case, the only issues examined in *Castle Rock* deal with a claim of procedural due process violations.

Defendants assert in their motion that an action under section 1983 requires violation of a federal right. This is generally correct, but misunderstands the nature of entitlements which may be protected by the Fourteenth Amendment's guarantee of procedural due process. Entitlements under law, "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as **state law**." *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756, 125 S. Ct. 2796, 2803, 162 L. Ed. 2d 658 (2005) (emphasis added).

In *Castle Rock,* the plaintiff's claim for the violation of her procedural due process rights turned on whether she had an entitlement under Colorado State law to have a restraining order enforced. The restrained person in that case murdered Plaintiff's children after Plaintiff repeatedly contacted law enforcement to ask that the order be enforced.  The restrained person was prohibited from having contact with the children. The Tenth Circuit held that Plaintiff did have a protected property interest in the enforcement of her restraining order that had been violated. *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 748, 125 S. Ct. 2796, 2798, 162 L. Ed. 2d 658 (2005)

The Supreme Court reversed the Tenth Circuit. The reversal was based on their contrary interpretation of Colorado state law, specifically finding that the police officers employed by the Town of Castle Rock had sufficient discretion under Colorado law that the enforcement of the order was not mandatory and that consequently no entitlement existed under Colorado state law. *Id*. Without the entitlement there was no procedural due process violation. *Id*.

In the instant case, the applicable New Mexico statute is NMSA 1978 §29-1-1 which states, "It is hereby declared to be the duty of every sheriff, deputy sheriff, constable and every other peace officer to investigate all violations of the criminal laws of the state which are called to the attention of any such officer or of which he is aware, and it is also declared the duty of every such officer to diligently file a complaint or information, if the circumstances are such as to indicate to

a reasonably prudent person that such action should be taken, and it is also declared his duty to cooperate with and assist the attorney general, district attorney or other prosecutor, if any, in all reasonable ways. Such cooperation shall include the prompt reporting of all arrests for liquor law violations at licensed liquor establishments to the department of alcoholic beverage control. Failure to perform his duty in any material way shall subject such officer to removal from office and payment of all costs of prosecution."

There is a wealth of case law interpreting this statute which holds that § 29-1-1, NMSA 1978, does in fact impose mandatory duties on law enforcement officers. Multiple cases have held that this creates a reasonable expectation that the officers will comply with the statutory duties. The statute and case laws which interpret it create a property interest with universal expectation of enforcement.

In *Schear,* liability was found to exist for breach of duty under § 29–1–1 when law enforcement officers' failure to respond to a call reporting a crime in progress. *Schear v. Bd. of Cty. Comm'rs of Bernalillo Cty.,* 1984-NMSC-079, ¶ 1 and 23, 101 N.M. 671, 677, 687 P.2d 728, 734. In *Schear,* the plaintiff suffered a brutal rape and other injuries as a result of the officers' failure to respond to the call. *Id.*

*Schear's* holding has repeatedly been reiterated and reinforced by the New Mexico Supreme Court. *"Schear* establishes that Section 29–1–1 created a duty that accrues to the benefit of specific individuals—i.e., that it creates an individual right." *California First Bank v. State*, 1990-NMSC-106, ¶ 35, 111 N.M. 64, 74, 801 P.2d 646, 656 (citing *Schear*). In *California First Bank v. State,* the plaintiff in that case alleged the following set of facts. Employees at a bar in Gallup sold alcoholic beverages to Harrison Shorty, a Navajo Indian, knowing that he was an

intoxicated person. At some point in the evening, Shorty fired several gun shots outside the bar. Sheriff deputies observed Shorty do this but failed to apprehend or arrest him. *Id*. at ¶ 3.

Not long after the shooting incident, Shorty allegedly left Eddie's Bar and drove north on U.S. Road 666. At the intersection of U.S. Road 666 and State Road 264, Shorty crossed the center line of the highway in his truck and collided with a vehicle driven by plaintiff, who was on vacation with his wife and children. Several members of plaintiff's family were killed and the rest were severely injured. *Id*. at ¶ 4. The complaint alleged that the Gallup Police Department and its employees were acting in the capacity of agents, servants, or employees of the City, and the Sheriff's Department and its employees were acting as agents, servants, or employees of the County. Although Eddie's Bar and other drinking establishments in Gallup were notorious as "Indian Bars" with drinking excesses, the City and County had articulated a policy not to interfere with the drinking activity inside these establishments and instructed law enforcement officers under their control not to enter bars for the purpose of enforcing the liquor control laws. The City and County also instructed law enforcement officers not to apprehend or arrest persons driving while under the influence of alcohol. *Id*. at ¶ 5. Based on these set of facts, the New Mexico Supreme Court held that the sheriff deputies' failure to apprehend the drunk driver or investigate the disturbance at Eddie's Bar, proximately caused personal injury to the McKeen family, and sufficiently stated a cause of action for negligent violation the plaintiff's right secured by section 29-1-1. *California First Bank v. State*, 1990-NMSC-106, ¶ 37, 111 N.M. 64, 75, 801 P.2d 646, 657

In *Torres,* the New Mexico Supreme Court provided further guidance on what class of people have an entitlement by virtue of section 29-1-1, "[w]hen the duty to investigate is breached and the wrongdoer is not apprehended, the risk of injury may extend to a known individual, as

in *Schear,* or to a class of individuals, as in *California First Bank.* In most circumstances, however, the identity of potential victims will not be known to the investigating officers. Because it is now as easy to travel from Albuquerque to Los Angeles as it is to travel from Albuquerque to Las Cruces, New Mexico, the statutory duty to investigate logically must extend to benefit or protect all foreseeable victims, including those persons outside the state." *Torres v. State*, 1995-NMSC-025, ¶ 24, 119 N.M. 609, 615, 894 P.2d 386, 392.

In *Torres,* a gunman entered an Albuquerque bagel shop and killed three people. Witnesses described the gunman to the Albuquerque Police Department ("APD"), APD proceeded to engage in a concerted and well publicized manhunt for the gunman. The gunman was able to evade detection and board a bus to Los Angeles. Two days after committing the murders in Albuquerque the gunman killed two people in Los Angeles, California. The estates of the victims in California filed claims against APD under the New Mexico Tort Claims Act for breach of section 29-1-1. *Torres v. State*, 1995-NMSC-025, ¶¶ 2-6, 119 N.M. 609, 611, 894 P.2d 386, 388. The *Torres* plaintiffs were able to pursue their claims under section 29-1-1 even though they were not present in New Mexico and had no discernible connection to the gunman or to Albuquerque. They were nonetheless foreseeable plaintiffs under New Mexico law because they suffered from the same type of harm that the gunman inflicted in Albuquerque – gun violence. In the instant case, Talamantes-Romero committed an act of gun violence that Officer Tapie failed to investigate properly and Jacqueline Vigil was a subsequent foreseeable victim of gun violence. Under New Mexico law, it is clear that Jacqueline Vigil has an entitlement under § 29-1-1 and that the entitlement was breached without any due process of law.

This marked difference in Colorado and New Mexico State law leads to a different outcome in this case while applying the same principles and same logic as stated in the *Castle Rock* decision.

In the instant case, the New Mexico Supreme Court has repeatedly held that § 29-1-1 creates an individual right. Defendants assert that § 29-1-1 is discretionary in function because of the statutory language which makes reference to a "reasonably prudent person." In the instant case, Plaintiff has alleged facts in which a reasonably prudent person would have their mandatory duty to act triggered under the statute. Under the 12(b)(6) standard, those facts are taken as true. If Defendants contend that the facts presented do not meet a threshold standard for mandatory action, the appropriate motion to argue that point would be on summary judgment – not a motion to dismiss.

The case law further supports that this individual right is not "incidental". Footnote 7 of *California First Bank v. State* speaks directly to this issue, "[i]t may be argued that in *Schear* the identity of the victim was known to the police, whereas here the sheriff deputies knew only the identity of the person who was violating the law and did not have specific knowledge of the McKeen family. This distinction is not dispositive of the existence of a right on the part of the McKeen family. *Schear* held that Section 29–1–1 created a duty on the part of law enforcement officers and allowed the imposition of liability for injury proximately caused by negligent breach of that duty. Extension of that duty to the McKeen family rested upon the foreseeability of a risk of injury to the traveling public in the event sheriff deputies failed to apprehend Shorty after they knew of his dangerously intoxicated condition." *California First Bank v. State*, 1990-NMSC-106, 111 N.M. 64, 74, 801 P.2d 646, 656 (footnote 7).

In the instant case, sufficient facts have been pled to plausibly assert that Officer Tapie knew the identity of both Luis Talamantes-Romero and Eduardo Aguilar during the course of his investigation into the domestic violence and shooting at or from a motor vehicle incidents. One of the officers said during the course of that investigation that these guys, referring to Talamantes-

Romero and Aguilar, are obviously dangerous. While Officer Tapie did not know specifically that Jacqueline Vigil would be harmed, under New Mexico State law § 29-1-1 creates an entitlement that allows for the imposition of liability for foreseeable risk of injury to the public. Similar to *California First Bank,* the danger here was to the "traveling public" in the event law enforcement failed to apprehend Talamantes-Romero after they knew about the danger he posed.

Furthermore, while Jacqueline Vigil does have a remedy under New Mexico tort law, she does not have the ability to achieve full relief commensurate with the value of the property interests she was deprived of. The New Mexico Tort Claims Act contains damages caps that prohibit her from obtaining full relief and compensation under the law. There is no adequate post deprivation relief process which balances with Ms. Vigil's interests in protecting her right to bodily integrity and her right to live. In cases where Courts have indicated adequate post deprivation remedies exist, the interests at stake are not fundamental interests like a person's right to bodily integrity or right to continue living.

None of the case law cited by Defendants support their contention that Plaintiff must show that a pre-deprivation hearing was impracticable in order to make out a procedural due process violation claim. The very case Defendants cite weigh against that contention, "[t]wo terms ago, we reaffirmed our holding in *Parratt in Logan v. Zimmerman Brush Co*., 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), in the course of holding that post deprivation remedies **do not** satisfy due process where a deprivation of property is caused by conduct pursuant to established state procedure, rather than random and unauthorized action." *Hudson v. Palmer*, 468 U.S. 517, 532, 104 S. Ct. 3194, 3203, 82 L. Ed. 2d 393 (1984). Here the Plaintiff has argued that the City's Sanctuary City Policy was a moving force behind the deprivation of Ms. Vigil's liberty interests

and was also a direct cause of her injuries, consequently the injury was caused by conduct pursuant to established state procedure.

Officer Tapie knew that he was investigating multiple dangerous individuals, he knew for a fact that one of them was Eduardo Aguilar and APD had information as to his date of birth and personal identifiers from past cases. Officer Tapie also had sufficient facts available to him to trigger his duty to investigate and file a complaint against Talamantes-Romero. He had actual knowledge that these individuals were dangerous and had just committed a gun crime. Under the circumstances, any officer in Officer Tapie's position would know that he needed to do more to discharge his duties under New Mexico law and, that if he failed to do so, people would foreseeably be subjected to additional gun violence.  The body of law developed from § 29-1-1 clearly establish that Officer Tapie possessed a duty that he breached and, in so doing, he denied Ms. Vigil her rights to procedural and substantive due process.

A moving force of Officer Tapie's failure to investigate, apprehend and detain Talamantes-Romero is the City of Albuquerque's Sanctuary City Policy. Talamantes-Romero is a known felon and illegal alien. Officer Tapie had access to this information through use of the National Crime Information Center ["NCIC"] and court records.

The City Policy, as described in paragraph 39 of the Plaintiff's First Amended Complaint ["FAC"], prevents the collection or inquiry in any way regarding the citizenship or immigration status of an individual. This policy prevents APD Officers, such as Officer Tapie, from checking the NCIC to determine a criminal suspect's immigration status. As alleged in paragraph 111 of the Plaintiff's FAC, Officer Tapie had reason to check NCIC for entries for Talamantes-Romero by his name as well as his aliases, including the alias "Pelon." If Officer Tapie did look at Talamantes-Romero's NCIC and observed information about his immigration status, the Sanctuary City Policy

prohibited him outright from "collecting" that information. The Sanctuary City Policy expressly states that the City and its employees may only communicate information about a person's immigration status that has been "collected." City Councilor Pat Davis succinctly and brazenly described the City's goal of circumventing federal immigration law that prohibits any government entity from prohibiting or in any way restricting a person or entity from sending information regarding a person's citizenship or immigration status by stating the following, "[w]hat our bill simply says is, '[w]e comply with the federal law that requires us to turn over information if we have it. We're just not going to have it." FAC paragraph 80.

Willful blindness or reckless indifference does not provide a person with a blank check to violate federal law. In *Glob.-Tech Appliances, Inc. v. SEB S.A,* the Supreme Court of the United States held that a manufacturer who engaged in an elaborate patent violation scheme with layers of plausible deniability could be held liable for violating patent law due to their willful blindness. The Court noted that every federal circuit aside from one articulated the doctrine of willful blindness in slightly different ways, but agree on two basic requirements, "(1) The defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769, 131 S. Ct. 2060, 2070, 179 L. Ed. 2d 1167 (2011).

In the instant case, the City knows that they have obligations to comply with federal immigration law.  Councilor Davis plainly states as much when he says the City will "comply" with federal law. The City also knows that there is information that its employees, including police officers, will come across regarding a person's immigration status. The City policy instructs that this information not be collected on any inquiries made for the information. The policy then bans communication of any information the City has not collected. While the policy read literally does

not ban all communications regarding a person's immigration status, it is the policy's explicit goal to do so – and they achieve that goal with a plan for willful blindness that perfectly fits the test as set out in *Glob.-Tech Appliances, Inc.*

The City knows that there are dangerous, violent felons in the City of Albuquerque who are illegal aliens. FAC at para 85. The City also knows that some of the violent felony offenses committed in Albuquerque are committed by street gangs, like Talamantes-Romero's gang, whose membership is comprised primarily of illegal aliens. FAC at para 86. The City is deliberately indifferent to the inherent risks these individuals pose to various segments of the public and individuals as there is no exception in the Sanctuary City Policy that allows communication of immigration information for manifestly dangerous illegal aliens involved in criminal activity like Talamantes-Romero.

The Sanctuary City Policy as applied violates 8 U.S.C. § 1373. That statute prohibits any governmental entity from prohibiting any person from sending information pertaining to a person's immigration status to any individual. Had the City not prevented Officer Tapie from being able to communicate Talamantes-Romero's immigration status, his crime spree could have been stopped before he took Jacqueline Vigil's life.

The Sanctuary City Policy was held out by the City as "an immigrant friendly" policy. Councilor Davis with a wink and a nod publicly announced that the City would actively work to circumvent federal efforts to enforce immigration law. The policy and multiple city officials plainly state that they will ban immigration officials from using space in MDC to check the immigration status of persons arrested for crimes. These policies which were publicly announced have the effect of encouraging illegal immigrants engaged in criminal activity to live in Albuquerque.   This encouragement appears to violate 8 U.S.C. § 1324(a)(1)(A)(iv) which

criminalizes any person engaging in conduct that, "encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law." As pled in Plaintiff's FAC, the City has actual knowledge that illegal aliens will enter the country and live in Albuquerque or will continue to live in Albuquerque, a part of the United States, because of the City's Sanctuary City Policy.

The Sanctuary City Policy also is expressly designed to shield illegal aliens from detection by hindering the ability of law enforcement officers and other local government employees from engaging in voluntary communication with federal immigration. Shield from detection, for purpose of the statute making it unlawful for a person to shield from detection an illegal alien, means the use of any means to prevent the detection of illegal aliens in the United States by the government. *United States v. Ye*, 588 F.3d 411, 416 (7th Cir. 2009). Section 1324(a)(1)(A)(iii) provides that when a person "conceals, harbors, or shields from detection" an illegal alien (or attempts to do the same), he has committed a felony. *Id*. Whether that conduct "tends substantially" to assist an alien is irrelevant, for the statute requires no specific quantum or degree of assistance. Congress could not have been clearer: it said that concealing, harboring, or shielding from detection an alien is unlawful conduct, regardless of how effective a defendant's efforts to help the alien might tend to be. *Id*. If a person commits a relatively nominal act that is proscribed by § 1324(a)(1)(A)(iii), the executive branch has the discretion to forego prosecution. *Id*.

There is admittedly some room for disagreement as to what the term "an alien" means. Whether a specific person, a readily identifiable group of aliens, or if the term could apply to aliens in the general sense. Given Congress's intent in enacting 8 U.S.C. § 1324, as described by the Seventh Circuit, it seems implausible that the prohibited conduct would be penalized for encouraging, harboring or shielding a single alien and not be penalized for offering aiding or

abetting the same conduct for a large number of aliens. Assuming for the sake of argument that the prohibitions apply only to aliens who are identifiable before the prohibited aid is offered, the City takes steps to willfully blind itself and its employees from learning that any person is actually an alien due to their ban on inquiries being made about any person's immigration status, and the ban on collecting information relating to a person's immigration status. The City also made it publicly known through Councilor Davis's statement that this was their stated policy goal – which would also plausibly be read by aliens and understood as a form of encouragement. The City's Policy also directly creates a state created danger which created or increased Ms. Vigil's vulnerability to private violence.

Mayor Keller affirmatively acted in this case by passing into law the City's Sanctuary City ordinance. The Sanctuary City law violates federal immigration law. The Sanctuary City law also caused the violation of Jacqueline Vigil's constitutional rights to be free from death and bodily harm. Officer Tapie acted in conformity with the Sanctuary City Policy and together Keller, Tapie and the City of Albuquerque violated federal immigration law during Officer Tapie's investigation into the domestic violence incident and shooting committed by Talamantes-Romero and Eduardo Aguilar prior to Jacqueline Vigil's murder. Both actions led to private violence from Talamantes-Romero which caused injury to Plaintiff. Had Talamantes-Romero been in custody, he could not have hurt Jacqueline Vigil. The Defense alleges that these claims sound in negligence and there is a lack of affirmative action – this is not the case. This Policy was enacted intentionally with Councilor Davis's stated intention of making the City and all of its employees willfully blind, regardless of the foreseeable harm that would result from Officer Tapie, Doe and other APD officers following the City's Policy. The FAC alleges facts which shock the conscience when the

truth of those facts are assumed – that the City was willfully blind to violent crime, death and destruction. Plaintiff's facts must be taken as true on a motion to dismiss.

The actions of Keller and Tapie increased the risk posed to Jacqueline Vigil. As a female motorist in the City of Albuquerque, she was a member of a limited and specifically definable group that Talamantes-Romero had a history of preying on. The crimes committed by Talamantes-Romero in 2019 were either gun crimes or automobile related theft crimes. Talamantes-Romero posed a risk to this limited and specifically definable group of people whom Jacqueline Vigil was a part of.

Mayor Keller's conduct in enacting and enforcing the Sanctuary City Policy created a near certainty that dangerous illegal aliens would harm citizens in Albuquerque so long as the sanctuary city ordinance was in effect. As alleged in the FAC, Mayor Keller and the City of Albuquerque know that some violent crime committed in Albuquerque are committed by illegal aliens. Mayor Keller and the City of Albuquerque also know that some number of violent illegal aliens are detained, prosecuted or deported by the federal immigration system. Mayor Keller and the City of Albuquerque know that by enacting a policy which shield **__all__** illegal immigrants in Albuquerque from being detected or detained by federal authorities, without exceptions for truly dangerous and violent individuals like Talamantes-Romero or criminal organizations made up of illegal immigrants such as the Juaritos Maravilla street gang, that they are engaging in the affirmative act of enacting a policy that as a matter of statistical certainty will subject the public to danger they would have avoided but for the City policy.

The City entered into this policy in 2018. Since 2018, violent crime has surged in Albuquerque. FAC at 90. The City was so determined to prioritize its Sanctuary City Policy over public safety that they refused to accept a half million dollar grant as offered by the federal

government to fight crime. Jacqueline Vigil was one of 82 people murdered in Albuquerque in 2019. The precise number of those murders committed by illegal aliens who are being encouraged, aided and ultimately protected by the City's Sanctuary City Policy is not yet known.

The fact that the City ignored Talamantes-Romero's crime spree given his criminal history tends to shock the conscience. In the FAC, paragraphs 20 – 80 describe Talamantes-Romeo's criminal history in detail as well as his most recent crime spree. These wanton acts of gun violence could have been stopped with a single phone call to immigration. The City's policy prevented that from happening.

The City's policy, which is in clear violation of existing federal law, that foreseeably will cause death and destruction to law abiding Albuquerque citizens was kept in place as crime spiraled out of control after it went into effect also shocks the conscience. The City was recklessly indifferent to the harm this law would cause when it was enacted. The City remains recklessly indifferent to this day.

The City's policy also cut off Ms. Vigil from aid. Immigration and Customs Enforcement's ("ICE") mission statement is, "to protect America from the cross-border crime and illegal immigration that threaten national security and public safety." Courts have previously held defendants liable for creating a danger by cutting off public or private aid, even though the defendants' actions of cutting off aid in those cases more directly caused the victim's harm. *Valdez v. Roybal*, 186 F. Supp. 3d 1197, 1267 (D.N.M. 2016) (internal citations omitted). The City's systemic official policy of cutting of people like Ms. Vigil from this type of aid is particularly egregious and conscience shocking because no other public entity or private entity is capable of providing the aid as stated in Immigration and Custom Enforcement's mission statement. Sam Vigil, Jacqueline Vigil and others in the community could not have protected themselves from the

danger posed by Talamantes-Romero and enhanced by the Defendants on their own. Citizens are not able to act as vigilante police officers or novice investigators. They cannot enforce United States Immigration law. The City's policy has the practical effect of subjecting Ms. Vigil to extreme danger and cutting off all sources of meaningful aid.

## II. Qualified Immunity

The Defendants raised the qualified immunity defense in their motion to dismiss. In other Circuits around the country, granting a motion to dismiss based on qualified immunity is disfavored for the practical reason that qualified immunity analysis is fact intensive. *Evans–Marshall v. Bd. of Educ. of Tipp City Exempted Village Sch. Dist.,* 428 F.3d 223, 235 (6th Cir.2005) (Sutton, J., concurring) (observing that the fact-intensive nature of the applicable tests make it "difficult for a defendant to claim qualified immunity on the pleadings *before discovery* " (emphasis in original)); *see also Jacobs v. City of Chicago,* 215 F.3d 758, 775 (7th Cir.2000) (Easterbrook, J., concurring).

In *Kerns v. Bader,* then Judge Gorsuch wrote, "[w]hen it comes to deciding the second qualified immunity question, it is 'not enough to look at,' and declare a law enforcement officer liable, based on such 'generalized principles.'" *Medina v. City and County of Denver,* 960 F.2d 1493, 1497–98 (10th Cir.1992) (citing *Anderson v. Creighton,* 483 U.S. 635, 639–40, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). The Supreme Court vigorously underscored the point recently, reminding us with some apparent exasperation that it has "repeatedly told courts ... not to define clearly established law at a high level of generality… [F]or any court to reach a determination that a violation of clearly established law has taken place a "more particularized" inquiry is required." *Anderson,* 483 U.S. at 640. The court must ask whether "every reasonable

official would have understood that *what he [did]* violate[d] that right." *Kerns v. Bader*, 663 F.3d 1173, 1182–83 (10th Cir. 2011).

Once the qualified immunity defense is asserted, the plaintiff "bears a heavy two-part burden" to show, first, "the defendant's actions violated a constitutional or statutory right," and, second, that the right was "clearly established at the time of the conduct at issue." *Archuleta v. Wagner,* 523 F.3d 1278, 1283 (10th Cir.2008) (internal quotation marks omitted). The Plaintiff has pled his complaint in large part based on information and belief. No formal discovery has taken place and there may well be facts that exist not yet known to the Plaintiff that would assist Plaintiff in carrying his burden on qualified immunity. At present, the Plaintiff does not even know the name of a Defendant he has sued.

A motion to dismiss on qualified immunity grounds, at this point in time, with no discovery having taken place is premature and should be denied because the parties and the court are not in a position to engage in a particularized inquiry on the second prong of the qualified immunity test – whether the law is clearly established. That being said, the Plaintiff has alleged facts to satisfy the first prong of the qualified immunity analysis, that a constitutional violation has occurred. Plaintiff has a right to bodily integrity and a right to continue living. Those rights were violated by Defendants' actions described in this motion response and the FAC which deprived Ms. Vigil of procedural due process and those same actions which increased the risk that Ms. Vigil would be the victim of private violence.

The second prong of the qualified immunity analysis is likewise met. The Tenth Circuit recognizes claims for violations of procedural due process and state created danger. "Though the elements of the state-created danger test are clearly established, it also must be clear to which fact scenarios and government actors we apply the test, and what types of conduct are "conscience

shocking" under the sixth factor." *Green v. Post*, 574 F.3d 1294, 1297 (10th Cir. 2009) (conscience-shocking conduct is "difficult to define and requires an assessment of the totality of the circumstances of each particular case" (internal quotation marks omitted)). But, as we explained above, the application of an established test even to a new fact pattern does not necessarily require a finding of qualified immunity. *Casey v. City of Federal Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007)." *Est. of Reat v. Rodriguez*, 824 F.3d 960, 965–66 (10th Cir. 2016), *as amended on reh'g in part* (Aug. 12, 2016)

Plaintiff has not located a case in this circuit or any other that squarely addresses the factual scenario presented where a municipality seeks to frustrate federal immigration law and endangers its citizens. However, in cases like the instant case, where the purpose behind a City ordinance is to violate the law, that should be sufficiently clear to the policy makers and the City employees carrying out the policy that their actions are unconstitutional. New Mexico State law that has been cited to at length is also well established to the point that the City and the individual Defendants would know that the City policy and resulting harm that flows from it violates the federal constitution and violated Ms. Vigil's rights.

In a recent Supreme Court case, an inmate "complained that, for six full days correctional officers confined him in a pair of shockingly unsanitary cells. The first cell was covered, nearly floor to ceiling, in 'massive amounts' of feces; all over the floor, the ceiling, the window, the walls, and even 'packed inside the water faucet.'" *Taylor v. Stevens*, 946 F.3d 211, 218 (CA5 2019). Fearing that his food and water would be contaminated, Taylor did not eat or drink for nearly four days. Correctional officers then moved Taylor to a second, frigidly cold cell, which was equipped with only a clogged drain in the floor to dispose of bodily wastes. Taylor held his bladder for over 24 hours, but he eventually (and involuntarily) relieved himself, causing the drain to overflow and

raw sewage to spill across the floor. Because the cell lacked a bunk, and because Taylor was confined without clothing, he was left to sleep naked in sewage." *Taylor v. Riojas*, 141 S. Ct. 52, 208 L. Ed. 2d 164 (2020).

The Fifth Circuit found a constitutional violation, but held that it was not a clearly established violation, rationale being that while there was case law stating that these inhumane conditions would violate the Eighth Amendment if the Plaintiff were in those conditions for a period of time measured in months, there was no case law that established that these objectively horrifying cell conditions would violate an inmate's rights if he were in the inhumane conditions for only a few days. *Taylor v. Stevens*, 946 F.3d 211, 222 (5th Cir. 2019), *cert. granted, judgment vacated sub nom. Taylor v. Riojas*, 141 S. Ct. 52, 208 L. Ed. 2d 164 (2020). The Fifth Circuit noted in their decision that the Supreme Court has admonished lower courts to not define constitutional rights at a high level of generality. *Id*.

The Supreme Court reversed the Fifth Circuit holding that no reasonable correctional officer could have concluded under the circumstances of the case that it was constitutionally permissible to house Plaintiff in such deplorably unsanitary conditions for such an extended period of time. *Taylor v. Riojas*, 141 S. Ct. 52, 52–54, 208 L. Ed. 2d 164 (2020). The Supreme Court cited to its previous decision in *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (explaining that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question."). *Id*.

The Supreme Court in the *Taylor* decision also made particular note of the statements of correctional officers that evidenced their state of mind and intentions in placing the Plaintiff in that case in each of the two cells at issue, "[t]he record suggests that at least some officers involved in Taylor's ordeal were deliberately indifferent to the conditions of his cells." See, *e.g.,* 946 F.3d at

218 (one officer, upon placing Taylor in the first feces-covered cell, remarked to another that Taylor was "going to have a long weekend."); *ibid.*, and n. 9 (another officer, upon placing Taylor in the second cell, told Taylor he hoped Taylor would "f***ing freeze."). *Id*.

In the instant case, like *Taylor,* we have a very telling statement from Councilman Davis that  the City's intention is to circumvent federal immigration law. When a municipality sets out to violate federal law with official policy, they should not be able to claim that they were not on fair notice that their actions would violate the law for purposes of Section 1983 – the gravamen of the policy is to direct individuals such as Officer Tapie to take action which violates the law. Officer Tapie and Officer Doe acted in accordance with the City policy to violate federal law and therefore also have fair notice that their actions offend the constitution. Mayor Keller has individual liability as he was a final policymaker of the Sanctuary City Policy.

The official capacity claims and the claims asserted directly against the City cannot be dismissed pursuant to a qualified immunity defense. "Municipalities do not enjoy immunity from suit—either absolute or qualified—under § 1983". *Leatherman v. Tarrant Cty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 166, 113 S. Ct. 1160, 1162, 122 L. Ed. 2d 517 (1993).

### III. Municipal Liability

For a municipality to be liable on account of its policy, the plaintiff must show, among other things, either (1) that the policy *itself* violated federal law or authorized or directed the deprivation of federal rights or (2) **that the policy was adopted or maintained by the municipality's policymakers "with 'deliberate indifference' as to its known or obvious consequences** ... A showing of simple or even heightened negligence will not suffice." *Board of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 117 S.Ct. 1382, 1390, 137 L.Ed.2d 626 (1997). *See also, e.g., City of Canton, Ohio v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 1206, 103

L.Ed.2d 412 (1989) (municipal liability requires "deliberate indifference to the constitutional rights of its [the City's] inhabitants"); *Burge v. St. Tammany Parish,* 336 F.3d 363, 370 (5th Cir.2003); *Piotrowski v. City of Houston,* 237 F.3d 567, 579 (5th Cir.2001*). Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force,* 379 F.3d 293, 309 (5th Cir. 2004)(emphasis added).

Where a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward. Section 1983 itself "contains no state-of-mind requirement independent of that necessary to state a violation" of the underlying federal right. *Daniels v. Williams,* 474 U.S. 327, 330, 106 S.Ct. 662, 664, 88 L.Ed.2d 662 (1986). In any § 1983 suit, however, the plaintiff must establish the state of mind required to prove the underlying violation. Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably. Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains. *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404–05, 117 S. Ct. 1382, 1388–89, 137 L. Ed. 2d 626 (1997).

We consequently concluded that "'[i]ndividual liability under § 1983 must be based on personal involvement in the alleged constitutional violation,'" but "[p]ersonal involvement is not limited solely to situations where a defendant violates a plaintiff's rights by physically placing hands on him." *Fogarty,* 523 F.3d at 1162 (quoting *Foote v. Spiegel,* 118 F.3d 1416, 1423 (10th Cir.1997)). Personal involvement does not require direct participation because § 1983 states "'[a]ny official who "causes" a citizen to be deprived of her constitutional rights can also be held liable.'" *Buck v. City of Albuquerque,* 549 F.3d 1269, 1279 (10th Cir.2008) (quoting *Snell v.*

*Tunnell,* 920 F.2d 673, 700 (10th Cir.1990)). *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010). Section 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights ... secured by the Constitution ...." (quoting 42 U.S.C. § 1983). *Id,*

In the instant case, the City's Policy violates 8 U.S.C. § 1373 and 8 U.S.C. § 1324. Due to the policy being in violation of federal law, Ms. Vigil's right to avoid death and maintain her bodily integrity were violated and municipal liability exists. Additionally, the City's Policy creates a state created danger as the policy created or increased the risk that she would suffer private violence at the hands of a dangerous illegal immigrant like Talamantes-Romero. The City has encouraged all illegal immigrants to live in Albuquerque by holding out the Sanctuary City Policy as an "immigrant friendly" policy. Section 1 of the Policy actually states, "The City of Albuquerque…welcomes and encourages immigrants to live, work and study in Albuquerque…."

This Policy has no carve out and no exception in its scope for criminals like Talamantes-Romero – consequently the Policy appeals to illegal aliens who commit crimes. The Policy and its provision mandating willful blindness allow dangerous illegal immigrants like Talamantes-Romero to live and work in Albuquerque. This increased the danger caused to Plaintiff.

Additionally, the City's prohibition on collecting information about a person's immigration status and further prohibition that City employees may only share information that has been collected works to shield dangerous illegal immigrants like Talamantes-Romero from immigration enforcement efforts. This also placed Ms. Vigil at increased risk of suffering death or great bodily

harm. Sufficient facts exist to support a finding that Plaintiff has made out plausible claims for direct municipal liability.

### III.     Claims under the New Mexico Tort Claims Act

### A.     Notice Arguments

Officer Tapie, Officer Doe and Mayor Keller are sued in their individual capacity in the Plaintiff's FAC. New Mexico case law is clear that there is no notice provision required to bring suit against public employees. *See Dutton v. McKinley County Bd. of Comm'rs,* 113 N.M. 51, 54, 822 P.2d 1134, 1137 (Ct.App.1991) ("The written notice requirements of Section 41–4–16A do not apply to claims against public employees.") (citing *Martinez v. City of Clovis,* 95 N.M. at 656, 625 P.2d at 585).

The Plaintiff alleges plausible facts in the FAC paragraphs 116-126 that the City of Albuquerque has actual notice that a claim may be filed against it. Those facts should be taken as true on a motion to dismiss. The test under New Mexico State law as to what amounts to actual notice under Section 41-4-16(B) is whether the actual notice, which can include police reports prepared by employees of the governmental entity that is sued, "must inform the proper governmental entity that there exists a likelihood that litigation may ensue." *Frappier v. Mergler*, 1988-NMCA-021, ¶¶ 15, 107 N.M. 61, 64–65, 752 P.2d 253, 256–57. "New Mexico courts consistently have applied the likelihood that litigation may ensue standard, looking at whether, from the totality of the circumstances known to the governmental entity charged with fault in the occurrence, a reasonable person would have concluded that the victim may claim compensation." *Lopez v. State*, 1996-NMSC-071, ¶ 12, 122 N.M. 611, 615, 930 P.2d 146, 150 (internal citation omitted).

In the instant case, Jacqueline Vigil was killed due to Talamantes-Romero committing the intentional tort of battery. The law enforcement officers' breach of their duties under section 29-1-1 were a proximate cause in causing the battery to happen. Given that Talamantes-Romero was quickly identified as the prime suspect in Ms. Vigil's murder and the fact that APD was investigating at least two other crimes committed by Talamantes-Romero shortly before Ms. Vigil was murdered are sufficient facts to put a reasonable person on notice that Ms. Vigil's estate may claim compensation. This inference is bolstered by the line of State Court cases cited earlier in this response which all allow recovery for damages under fact patterns similar to the fact pattern in the instant case.

### B.  Response to Unnecessary Parties Arguments

In response to the argument that the individual defendants be dismissed as they are "unnecessary parties," the Plaintiff points out that if the Court does find the Defendants' notice argument persuasive and dismisses the TCA claim against the City, the individual defendants would in fact be necessary parties for this claim to proceed. Plaintiff does agree that the City would need to indemnify the individual defendants. That does not mean, however, that the individual defendants are not the real parties in interest.

### C.  Response to Immunity Argument waiver as applied to Mayor Keller

Defendants argue that Mayor Keller's immunity has not been waived under the TCA as he is not a law enforcement officer. A similar legal issue was addressed in *California First Bank,* in that case the New Mexico Supreme Court allowed a claim against a County to proceed due to the police officers in that case failing to enforce drunk driving laws at the direction of the County. This is a close factual fit to the instant case where the individual officer Defendants, and in fact all of this, frustrate federal immigration law and enforcement efforts. While Mayor Keller is not a law

enforcement officer, he is vicariously liable for the Sanctuary City Policy carried out by the police officers. He should remain a defendant on this claim. These facts also apply in response to Defendants' arguments that Mayor Keller cannot be held liable as a supervisor under the section 1983 claims.

## CONCLUSION

The individual acts of the Defendants caused Jacqueline Vigil to lose her life. The City's Sanctuary City Policy caused this to happen. The policy as applied violates federal immigration law and also contributed to the violation of Ms. Vigil's constitutional right to bodily integrity and life. She was deprived of these rights and her rights under New Mexico state law without procedural due process. The Defendants' motion should be denied. To the extent the Court is inclined to grant any part or parts of the Defendants' motion, Plaintiff requests leave to amend his complaint. Plaintiff additionally seeks leave to amend to add facts to his complaint to support the arguments in this motion response to the extent they are not already included in the complaint.

Respectfully submitted,

*/s/ Robert Gorence*
Robert Gorence
Gorence Law Firm, LLC
300 Central Ave SW, Suite 1000E
Albuquerque, NM  87102
(505) 244-0214
gorence@golaw.us

---and---

*/s/ Jason Bowles*
Jason Bowles
Bowles Law Firm
P.O. Box 25186
Albuquerque, NM 87125-0186
(505) 217-2680
jason@bowles-lawfirm.com

---and---

*/s/ Todd J. Bullion*
Todd J. Bullion
300 Central Ave SW, Suite 1000E
Albuquerque, NM  87102
(505) 452-7674
toddjbullion@gmail.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 7th day of May, 2021, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Stephanie M. Griffin
(sgriffin@cabq.gov)
*Attorney for Defendants*


*/s/ Robert J. Gorence*
Robert J. Gorence
Gorence Law Firm, LLC